# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Hastings v. Jefco Equipment Co.*, 2013 IL App (1st) 121568

---

| | |
|---|---|
| Appellate Court Caption | DEIRDRE HASTINGS, Plaintiff-Appellant, v. JEFCO EQUIPMENT COMPANY, INC., Defendant-Appellee (Roszak/ADC, LLC; Rockford Ornamental Iron, Inc.; TR Sienna Partners, LLC; and Sienna, Inc., Defendants). |
| District & No. | First District, Fourth Division<br>Docket No. 1-12-1568 |
| Rule 23 Order filed<br>Rule 23 Order<br>withdrawn<br>Opinion filed | May 23, 2013<br><br>June 27, 2013<br>August 1, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action for the injuries suffered by an ironworker when steel beams being unloaded by a crane operator fell on her, the entry of summary judgment for the owner of the crane based on the finding that the crane operator was a borrowed employee of the ironworker's employer was reversed and the cause was remanded for further proceedings, since questions of material fact existed as to whether the crane operator's status precluded summary judgment, including the crane owner's right to discharge the operator and the control exercised by the ironworker's employer over the crane operator. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-L-8478; the Hon. Eileen Mary Brewer, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Steven R. Levin, of Levin, Riback Law Group, P.C., and Alvin R. Becker and Matthew D. Elster, both of Beermann Pritkin Mirabelli Swerdlove LLP, both of Chicago, for appellant.

Michael Resis, Marcie Thorp, and Joseph M. Eichberger, all of SmithAmundsen LLC, of Chicago, for appellee.

Panel

JUSTICE EPSTEIN delivered the judgment of the court, with opinion.

Presiding Justice Lavin and Justice Pucinski concurred in the judgment and opinion.

## OPINION

¶ 1        Plaintiff Deirdre Hastings appeals from the trial court's order granting summary judgment to defendant Jefco Equipment Co., Inc. Hastings was an ironworker employed by third-party defendant Area Erectors, Inc., at the Sienna condominiums construction site in Evanston, Illinois. On March 5, 2007, Hastings' shoulder and leg were injured when a load of steel beams being hoisted by a 90-ton crane fell from its rigging onto Hastings. In her amended complaint, Hastings asserted claims for negligence and premises liability against Jefco, the owner of the crane. She also brought claims against Roszak/ADC, LLC, the general contractor; TR Sienna Partners, LLC, the owner of the premises; TR Sienna, Inc., its manager; and Rockford Ornamental Iron, Inc., the steel fabricating company.

¶ 2        The record, developed through discovery, shows that on the date of the accident, Hastings and other Area ironworkers were unloading steel beams from the bed of a flatbed truck. In order to transport steel from the truck to a "shake-out" site, from which the steel would be moved onto the structure being built, the ironworkers used a 90-ton hydraulic truck crane owned by Jefco and operated by Greg Windbiel. At the time of the accident, Hastings was standing in the shake-out area, waiting for Windbiel to deliver a load of six steel beams. As Windbiel lifted the beams, they began to pivot counterclockwise in the air. As the load approached Hastings, it bounced three times, approximately 8 to 10 inches each time. Hastings reached up with her left hand and grabbed one of the columns in order to guide it, but as she took her hand off the column, one of the eyes "popped off the hook" of the crane and two of the steel beams struck her in the chest. Hastings fell, and one of the beams landed on and broke her right leg.

¶ 3        After the parties conducted discovery, Jefco moved for summary judgment. The circuit court granted summary judgment to Jefco on Hastings' negligence claim, finding that because the crane operator during the accident, Greg Windbiel, was a borrowed employee of Area, Jefco was not liable for Hastings' injuries. The trial court also granted summary

judgment to Jefco on Hastings' premises liability claim. The trial court later entered an order, pursuant to Illinois Supreme Court Rule 304(a) (Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010)), finding no just reason to delay the appeal. Focusing only on her negligence claim, Hastings' sole argument on appeal is that summary judgment was improper because questions of fact exist as to Windbiel's status as a borrowed employee.

¶ 4   We review the trial court's decision to grant summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). Summary judgment is proper where the pleadings, admissions, depositions and affidavits demonstrate there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Ioerger v. Halverson Construction Co.*, 232 Ill. 2d 196, 201 (2008); 735 ILCS 5/2-1005 (West 2010). We construe all evidence strictly against the moving party and liberally in favor of the nonmoving party. *Buenz v. Frontline Transportation Co.*, 227 Ill. 2d 302, 308 (2008). While summary judgment can aid in the expeditious disposition of a lawsuit, it is a drastic measure that should only be permitted where the movant's right is clear and free from doubt. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008).

¶ 5   An employee in the general employment of one employer may be loaned to another for the performance of special work and take on the status of a "borrowed employee" while performing the special service. *Kawaguchi v. Gainer*, 361 Ill. App. 3d 229, 240 (2005). If an employee is a borrowed employee at the time of allegedly tortious conduct, the employee's general employer cannot be liable for such conduct and any vicarious liability would rest on the borrowing employer. *Behrens v. California Cartage Co.*, 373 Ill. App. 3d 860, 863-64 (2007).

¶ 6   Our supreme court has long recognized "that the criteria reiterated in the Illinois case law for the existence of the master-servant relationship is the right to control, which includes the power of discharge." *Gundich v. Emerson-Comstock Co.*, 21 Ill. 2d 117, 123 (1960). Illinois courts have identified several factors to determine whether an alleged borrowing employer has the right to control an allegedly borrowed employee: the manner in which the performance of the employee's duties is directed, the mode of payment, the right to discharge, the terms of any written contract between the employers, and the general employer's ability to substitute among employees loaned to the borrowing employer. *Kawaguchi*, 361 Ill. App. 3d at 240; *Saldana v. Wirtz Cartage Co.*, 74 Ill. 2d 379, 390 (1978) (noting that factors to determine control include "the matter of hiring, the mode of payment, the right to discharge, and the manner of direction of the services" (internal quotation marks omitted)); see also *Dowe v. Birmingham Steel Corp.*, 2011 IL App (1st) 091997, ¶ 30 (separating the "right to control" from factors such as the "right to discharge," but noting that the right to control the manner in which the work is performed is considered to be the most important factor in determining status of borrowed employee). Other factors relevant to the question of borrowed employment include the level of skill required to perform the work; who deducts or pays for insurance, social security, and taxes on the employee's behalf; and the length of service for the special employer. *Dowe*, 2011 IL App (1st) 091997, ¶ 30; *O'Loughlin v. ServiceMaster Co. Ltd. Partnership*, 216 Ill. App. 3d 27, 34 (1991).

¶ 7   "Whether a loaned employee status exists is generally a question of fact, but it constitutes a question of law if the facts are undisputed and capable of one inference." *Prodanic v.*

*Grossinger City Autocorp, Inc.*, 2012 IL App (1st) 110993, ¶ 15; *Kawaguchi*, 361 Ill. App. 3d at 240. Our task is to review evidence in the record in a light most favorable to Hastings to determine if there are questions of material fact as to whether Windbiel was a borrowed employee of Area at the time of the accident.

¶ 8                    Right of Area to Discharge Windbiel and Ability
                         of Jefco to Substitute Employees

¶ 9      Hastings argues that there is a genuine issue of material fact as to Area's right to discharge Windbiel. "The alleged borrowing employer need not have the power to dismiss the alleged borrowed employee from his general employment; but, the alleged borrowing employer must have the power to dismiss him from the borrowed employment." *Kawaguchi*, 361 Ill. App. 3d at 240 n.6.

¶ 10     In his deposition, Windbiel stated that he believed that Area had the authority to order him off the jobsite. But Brian Price, Area's foreman, testified that if Area wanted a different operator, it would find a different crane to lease:

> "Q. If the crane lessee, in this case Area, had felt that the crane operator was incompetent or dangerous or didn't belong operating the crane, they could order that guy or girl off the jobsite, correct?
>
> A. I don't know that we could tell them off the jobsite, but we wouldn't be operating with the crane, we wouldn't be working with the crane.
>
> Q. You would call somebody else and lease a different crane?
>
> A. Yes."

According to Price, if Area was unhappy with the crane operator, Area would find a new crane company. This suggests not that Windbiel became an employee of Area, but that Area had to settle for whomever Jefco sent to operate the Jefco crane. It is not as if Area relied on Jefco or Jefco's operators for all crane work: Area also had its own 45-ton crane, and when Area used that crane, Area used one of its own operators.

¶ 11     Relatedly, nothing in the record suggests that Area had any input as to who would operate the Jefco crane. In his deposition, Windbiel stated that he was assigned to work at the Sienna site by Jefco's owner. Windbiel also explained that a 90-ton crane required an oiler (a mechanic for the crane), so typically he and Mike Olson worked together. It was not unusual for them to switch crane operator and oiler duty, as they did on the day of the accident, because they were both qualified to operate the crane. Yet there is nothing in the record that suggests Area had any control over who was operating the crane at a particular time: the crane rental agreement (discussed in detail below) is silent as to the particular Jefco worker or workers that would operate the crane.

¶ 12     To sum up, an unspecified crane operator (and oiler) came along with the crane rented from Jefco, and if Area wanted a different operator, it would lease from a different company. While Windbiel testified that he believed that Area had the ability to discharge him, Area's foreman suggested that Windbiel's services came as part of the crane agreement, such that if Area were unhappy with the crane operator's services, it would find a new crane company.

-4-

¶ 13                    Manner in Which the Performance of the
                           Employee's Duties Are Directed

¶ 14    Generally, it can be expected that when a contractor rents a 90-ton crane and a worker to operate it, the crane owner intends to retain control of the crane by retaining control over the worker operating it:

> " 'A continuance of the general employment is also indicated in the operation of a machine where the general employer rents the machine and a servant to operate it, particularly if the instrumentality is of considerable value. Normally, the general employer expects the employee to protect his interests in the use of the instrumentality, and these may be opposed to the interests of the temporary employer.' " *Robinson v. McDougal-Hartmann Co.*, 133 Ill. App. 2d 739, 742-43 (1971) (quoting Restatement (Second) of Agency § 227, cmt. c (1958)).

Jefco argues, however, that "testimony about jobsite activities *** shows that the crane operator was wholly under Area's control at the project and free from control by Jefco."

¶ 15    Jefco points out that Windbiel followed the hand signals of Area's workers when, at times, he could not see the load he was moving. Windbiel explained that he was "working in the blind," meaning that he did not have direct vision to where the load is picked or to where the load ultimately ended up. Windbiel therefore relied on hand signals of two different ironworker signalmen–one on the flatbed of a truck and another on the ground who directed the load to the shake-out site. Once the ironworkers rigged and secured the load on the truck, Windbiel lifted it, and he was only able to see the load for about 20 feet of movement.

¶ 16    This court has held that "[e]ven if an employee receives directions from a party other than his general employer such employee may nevertheless retain his status as an employee of the general employer." *Robinson*, 133 Ill. App. 2d at 742. More specifically, in *Gundich v. Emerson-Comstock Co.*, 21 Ill. 2d 117 (1960), our supreme court reasoned that by following such hand signals, a crane operator did not become a loaned employee of a general contractor:

> " 'The giving of the signals under the circumstances of this case was not the giving of orders, but of information; and the obedience to those signals showed co-operation rather than subordination, *and is not enough to show that there has been a change of masters.*' " (Emphasis in original.) *Gundich*, 21 Ill. 2d at 125 (quoting *Standard Oil Co. v. Anderson*, 212 U.S. 215, 226 (1909)).

Here, as in *Gundich*, Windbiel was obedient to the hand signals of Area employees, for that was the only way, other than radio or phone communication, that Windbiel could possibly operate the crane in the blind. But as in *Gundich*, that fact does not establish that Area had the right to control his actions as an employer would.

¶ 17    Moreover, in this particular case, there is testimony from Florencio Irizarry, an Area ironworker, that Windbiel routinely disregarded the hand signals from the ironworkers:

> "Q. So you had no problem with that crane operator obeying your hand signals, is that fair?

A. For the most part, meaning that half the time he'd listen and half the time just hillbillied it, made it fast, which is what we call it. That's what we call it."

Similarly, Irizarry stated that Windbiel would sometimes adjust the crane as he saw fit, without direction from Area workers:

"Q. *** [W]hen you gave [the operator] hand signals, he performed to your satisfaction, is that fair?

A. Like I said, not necessarily. Sometimes he wouldn't be paying attention, and he would do something else. Instead of coming out, he would boom up. They try to adjust. That's what he did a few times."

While Windbiel testified that he followed the signals of Area's ironworkers at all times when he was at the controls, Windbiel also stated that he had discretion to refuse a lift based on his view of wind conditions. Windbiel and Price agreed that Windbiel had a general right not to perform an unsafe lift, whether based on wind conditions, improper rigging, or if the crane was not functioning properly.

¶ 18 We acknowledge that nothing in the record suggests that Jefco representatives, beyond the two crane operators, were consulted regarding any specific lift or task that the crane operators performed at the jobsite on the day of the accident. But the testimony we have reviewed above is consistent with the general expectation that the owner of a 90-ton crane would want his operator to ensure safe operation of the crane:

"If the servant is expected only to give results called for by the temporary employer and to use the instrumentality as the servant would expect his general employer would desire, the original service continues. Upon this question, the fact that the general employer is in the business of renting machines and men is relevant, since in such case there is more likely to be an intent to retain control over the instrumentality." Restatement (Second) of Agency § 227, cmt. c (1958).

In other words, Jefco would expect Windbiel would safeguard the 90-ton crane he was operating, even though Windbiel would not be expected to seek Jefco's approval for each lift.

¶ 19 We are similarly unconvinced that other testimony in the record establishes Area's right to direct Windbiel's manner of work as a matter of law. Jefco points out that Area directed the crane operators where to put the crane; Area dictated how long the crane and its operators were to be at the jobsite and when the operators would take breaks; and Area's ironworking crew configured the crane, boom, and the jib for the work on-site. When viewing the evidence in a light most favorable to Hastings, however, we cannot conclude that the interaction between Area and Windbiel establishes Area's right to control his work.

¶ 20 For example, as to the configuration of the jib, Windbiel testified that he, Mike Olson (the other crane operator from Jefco), and "the ironworkers" decided together that a jib would be added to the crane's boom due to the distance and height needed to place the load into the shake out site. As with Windbiel following hand signals from Area workers, some level of cooperation and coordination could be expected between the crane operators and Area's ironworkers. Yet there are questions of fact as to who had the ultimate authority as to the configuration of the jib. Windbiel stated that he would "have the final say in terms of

-6-

whether or not the extra jib section is on the crane." The Area ironworkers took a different view: ironworker Tom Iverson stated that it would ultimately be the general contractor's decision (*i.e.*, the decision of Roszak/ADC, LLC) whether the time would be taken to take the crane apart and take off the jib; ironworker Florencio Irizarry testified that both the crane operators and the general contractor wanted the jib left on, but he told the operators not to put the jib on the crane.

¶ 21    To the extent that this evidence shows that Area exercised some level of control of Windbiel, there are significant factual questions as to Windbiel's ability to control the crane as he saw fit on the day of the accident. And as noted above, there are significant factual questions regarding Area's ability to discharge Windbiel and Jefco's ability to substitute another of its employees to operate the crane. The evidence relied on by Jefco, viewed in a light most favorable to Hastings, does not allow for a determination that Windbiel was Area's borrowed employee as a matter of law.

¶ 22                    Terms of Written Contract Between the Employers

¶ 23    Apart from arguing that Jefco actually controlled Windbiel's operation of the crane, Jefco argues that a purported contract between Jefco and Area establishes that Area had a right to control Windbiel. At issue is the following provision of a "standard short-term crane rental agreement":

"2. Indemnification: Lessee agrees that the equipment and all persons operating such equipment including Lessor's employees are under Lessee's exclusive jurisdiction, supervision and control and agrees to indemnify and save Lessor, its employees and agents harmless for all claims *** arising in any manner out of the Lessee's operation.

* * *

Lessee shall not be required to indemnify Lessor for its sole negligence, but Lessors [*sic*] liability for damages caused by the sole negligence of Lessor, its agents and employees hereunder shall be limited to the amount of Lessors [*sic*] liability insurance."

Jefco focuses on the first clause of the first sentence reproduced above, arguing that because Jefco's employees and equipment were under Area's "exclusive jurisdiction, supervision and control," Windbiel was Area's employee as a matter of law.

¶ 24    Hastings initially responds that there are factual questions as to the "validity, finality, and enforceability" of the lease agreement. The signature lines, indicating that Jefco and Area understood and agreed to the terms and conditions of the agreement, were left unsigned. The signature of an Area employee appears in a separate section, verifying the hours the crane was on the jobsite for March 5 and 6, 2007. While Hastings acknowledges that a party may become bound by an agreement through his acts and conduct, she argues that it is unclear if the parties were operating under a separate agreement. Hastings contends that the lease makes no mention of price, duration of the rental, acceptable methods of payment, or when the payment is due, and it contains no signature from the parties' representations "who would be reasonably expected to negotiate and agree to the terms of such a lease."

¶ 25    As Hastings acknowledges, assent to a written agreement may be demonstrated by the

conduct of the parties. See *Amelco Electronic Co. v. Arcole Midwest Corp.*, 40 Ill. App. 3d 118, 124 (1976); *Compass Environmental, Inc. v. Polu Kai Services, L.L.C.*, 379 Ill. App. 3d 549, 554 (2008). In *Amelco*, this court held that although a subcontractor did not sign an agreement with a general contractor, the subcontractor became bound by it because the subcontractor had received the written agreement, expressed no objection to it, began to work on the project, and acted consistent with the contract's terms (*e.g.*, submitting minority employment documentation). *Amelco*, 40 Ill. App. 3d at 125. So too here. Area received the lease agreement and used both the crane and the operators before and after the accident. An Area representative verified the hours the crane operators worked, as well as the hours the crane was on site, by signing in one section of the contract. Area's workers used hand signals to direct the crane, as contemplated by the agreement, which provided that they would use standard hand signals "to direct the equipment at all times when applicable."

¶ 26    While Hastings speculates that the parties had some other preexisting agreement, Hastings points to no evidence of any other agreement between the parties, as in the case relied upon by Hastings. See *Lundin v. Egyptian Construction Co.*, 29 Ill. App. 3d 1060, 1064 (1975) (finding that where there was already an existing oral agreement between the parties when defendant received a written contract, "it is just as logical to conclude that defendant was performing pursuant to the oral agreement as to conclude that it was performing pursuant to the [unsigned written contract]"). The lease here contains the dates Jefco provided the equipment and personnel; the customer (Area); the job name and location (Sienna Condos in Evanston); the type of crane leased; the operator and oiler names; and the signature of Area's foreman verifying the hours the crane was in operation on-site. The agreement also provides that "[f]ull payment for all charges is due upon billing" and establishes a monthly service charge for past-due accounts. The lease further provides "this document is the complete agreement of the parties and supersedes all other agreements or understandings, written or oral." We agree with the trial court that the evidence on record shows that the parties assented to the lease agreement through their conduct.

¶ 27    Contrary to Jefco's claim, however, the lease's indemnification language does not operate to make Windbiel an employee of Area as a matter of law. Courts outside Illinois considering nearly identical provisions in crane rental agreements have rejected arguments that this indemnification language, by itself, establishes an employment relationship between the lessor and the crane operator. While not binding, these cases are instructive as to the significance of the indemnification provision here.

¶ 28    For example, the Indiana appellate court, considering an indemnification provision with nearly identical language, "decline[d] to hold that this provision, by itself, establishe[d] that [a contractor] had exclusive control and authority over [a crane operator] for purposes of establishing an employment relationship." *Nowicki v. Cannon Steel Erection Co.*, 711 N.E.2d 536, 541 (Ind. Ct. App. 1999), *abrogated on other grounds by GKN Co. v. Magness*, 744 N.E.2d 397 (Ind. 2001). While concluding that such provisions might be relevant to the belief of the parties, the court reasoned that "[b]ecause such provisions are used primarily to allocate between the parties' financial responsibility for damages claimed by a third party, they cannot, by themselves, determine employment status." *Id.* The court concluded that the indemnification provision did "not establish that [the] crane operator [was] necessarily an

employee of [the contractor]." *Id.*

¶ 29 Similarly, in *Roderick v. Bugge*, 584 F. Supp. 626 (D. Mass. 1984), a federal district court confronting a similar agreement between a crane company and a lessee shipowner held that "the indemnification provision proves of marginal relevance to the borrowed servant issue notwithstanding its direct assignment of 'exclusive ... control' over the crane and operator to [the lessee]." *Roderick*, 584 F. Supp. at 629. The court found that "other portions of the indemnification provision belie any intention on the part of the parties to establish a borrowed servant relationship." *Id.* Specifically, the court noted that the lessee was "relieved of its duty to indemnify [the crane company] whenever [it] is 'sole[ly] negligen[t].' Yet were [the operator] to be deemed a borrowed servant, the percentage of the proven negligence that is attributable to him should have no bearing on [the crane company's] liability for his misconduct." *Id.* Further, "there would be no need in the first place for an explicit indemnification agreement were a borrowed servant relationship to exist, since [the crane company] would bear no legal responsibility for [the operator's] conduct." *Id.*; accord *Krzywicki v. Tidewater Equipment Co.*, 600 F. Supp. 629, 640 n.15 (D. Md. 1985) (agreeing with *Roderick* court that "there would be no need for an indemnification provision in a lease agreement *** if the crane operator were intended to be the borrowed servant of the lessee," and finding that servant was an employee of crane owner, not a borrowed employee of lessee, before interpreting indemnification clause in crane rental agreement). We conclude that the indemnification provision does not establish that Windbiel was a borrowed employee of Area. The indemnification provision here does not speak to the employment status of Jefco's crane operators; rather, the agreement makes explicit reference to Jefco's "employees," in stating that Area is under no duty to indemnify Jefco for its sole negligence or that of its employees.

¶ 30 Jefco argues that apart from the indemnification provision, the lease establishes a right to control because it provides that Area "agrees to provide competent and experienced personnel to direct the operation of the equipment." The very next clause in the contract, however, shows that the directions at issue are standardized hand signals:

"Lessee agrees to provide competent and experienced personnel to direct the operation of the equipment and further agrees that the Standard Crane and Derrick Signals in accordance with American Standard B30:2-1943 shall be used to direct the equipment at all times when applicable."

Jefco also points to the contract's requirement that Area "inspect and assume all liability for the adequacy of design or the strength of any rigging or lifting apparatus." Like the indemnification language above, these contract provisions do not speak to Windbiel's status as a borrowed employee: the former simply impose specific requirements as to the use of standard hand signals, and the latter allocate liability for certain defects in the equipment.

¶ 31 This is not to say that parties are not free to allocate risk by creating a borrowed employment relationship by agreement. We note that courts have relied on crane rental agreements in finding a borrowed employee relationship, where those agreements contain explicit language regarding the crane operator's employment status. See, *e.g.*, *Odum v. Superior Rigging & Erecting Co.*, 662 S.E.2d 832, 835 (Ga. Ct. App. 2008) (relying on

agreement to find borrowed employee relationship where contract provided that crane operator was under " 'Lessee's exclusive jurisdiction, supervision and control,' " but contract further provided that " 'at all times while the Operator is on the job site that Lessee has the right to exercise complete direction and control over the Operator, that Lessor will exercise no control over the Operator and that Lessee has the exclusive right to discharge the Operator from the work he is doing, that Lessee may require Lessor to replace the operator with another of Lessor's employees and that Lessee may put the crane operator to other work' "); *Estate of Bryant v. All Temperature Insulation, Inc.*, 916 P.2d 1294, 1297 (Kan. Ct. App. 1996) (finding that crane operator was employee of general contractor, not crane owner, where crane rental agreement stated that " 'personnel furnished by [crane company] *shall be employees of* [general contractor] and the laws of the state wherein this agreement is executed shall govern the *principal and agency relationship hereby created*' " and " 'all persons operating such equipment, including Lessor's employees, *become employees of*, and are under Lessee's exclusive jurisdiction, supervision and control' " (emphases added)). By contrast, the agreement here lacks specific language as to the crane operator's employment status. The contract allocates liability through indemnification, not by designating Area as the employer of Jefco's crane operators.

¶ 32    We emphasize that for the purposes of this appeal, Jefco does not rely on the lease agreement to establish that Area has a duty to indemnify Jefco; rather, Jefco's only argument as to the agreement is that it establishes that Windbiel was Area's employee. While we express no opinion as to Area's obligation to indemnify Jefco, we conclude that the lease does not establish that Windbiel was a borrowed employee of Area as a matter of law.

¶ 33                    Method of Payment; Who Deducts and Pays for Benefits

¶ 34    Jefco paid Windbiel's wages, provided him with health benefits, contributed to his pension, and was listed as his employer on his federal income tax form. Our supreme court has held that "[t]he mere fact that the employee does not receive his wages from the special employer will not defeat the finding of a loaned-employee situation." *A.J. Johnson Paving Co. v. Industrial Comm'n*, 82 Ill. 2d 341, 349 (1980) (concluding that decision that found loaned-employee relationship was not against the manifest weight of the evidence, even where employee received his wages from general employer). That holding has also been applied in the summary judgment context. *Prodanic v. Grossinger City Autocorp, Inc.*, 2012 IL App (1st) 110993, ¶¶ 6, 20 (concluding that summary judgment was proper, even where employee received his wages from general employer, where evidence overwhelming showed right to control).

¶ 35    While we agree that the identity of the party paying the employee does not control the borrowed employee question, we find no support in the record for Jefco's claim that Area "indirectly paid Windbiel's salary for the project," such that this factor supports a finding that Area controlled Windbiel. It is of course true that those paying Jefco for its services "indirectly" pay the salaries of Jefco's employees. Contrary to Jefco's argument, however, nothing in the record shows that Jefco was merely a conduit through which Windbiel was paid. See *Highway Insurance Co. v. Sears, Roebuck & Co.*, 92 Ill. App. 2d 214, 221-22

-10-

(1968) (concluding that business supplying temporary labor to various firms was merely "conduit" through which employees were paid, thus supporting finding of borrowed employee relationship). While Jefco and Area recorded the number of hours the crane operator worked on site, as well as the number of hours the crane was on site, nothing in the record shows how Area was billed for Jefco's services, whether Area was billed separately for Windbiel's time, or how Jefco paid Windbiel. It is these facts that would suggest that Jefco merely passed money from Area to its employee, Windbiel. See *Haight v. Aldridge Electric Co.*, 215 Ill. App. 3d 353, 367 (1991) ("Although [the employee] received his wages from [the general employer], [the general employer] would then bill [the borrowing employee] for [the employee's] time plus a bit of a premium."); *Russell v. PPG Industries, Inc.*, 953 F.2d 326, 330 (7th Cir. 1992) (concluding that where the general employer billed the borrowing employer for the number of hours the employee worked, and the amount charged included the salary the general employer paid plus a profit factor, the billing arrangement "militates in favor of a finding of control"). Thus, while not controlling, the fact that Jefco paid wages and provided benefits to Windbiel weighs against a finding that Windbiel was Area's borrowed employee.

¶ 36         Length of New Employment; Level of Skill Required to Perform Work

¶ 37     Finally, Hastings asserts that the length of the employment was short (only several hours over the course of two days), a factor that tends to show that Windbiel continued in his general employment with Jefco. Hastings also contends that the level of skill required to perform the crane operation was high, another factor supporting the determination that Windbiel continued in his general employment. Hastings notes that Windbiel was a certified crane operator by trade who had logged over 5,000 hours behind the controls of cranes similar to the one he operated at the Sienna site. We agree with Hastings that these factors support a finding that Windbiel was not a borrowed employee of Area.

¶ 38                                 Conclusion

¶ 39     Summary judgment is appropriate "when the right of the moving party is clear and free from doubt." *Adams v. Sheahan*, 233 Ill. 2d 276, 296 (2009). Here, when viewing the evidence in a light most favorable to Hastings, we conclude that there are questions of material fact as to Windbiel's employment status that preclude summary judgment in Jefco's favor. The indemnification clause in the written lease agreement does not, as a matter of law, establish that Windbiel was a borrowed employee. There are significant questions as to Jefco's right to discharge Windbiel, and the record shows that Jefco chose (and could substitute) any of its crane operators for the Sienna site project. Finally, there are questions of facts as to Area's actual exercise of control of Windbiel's work on the project. Accordingly, we reverse the grant of summary judgment in Jefco's favor and remand this case for further proceedings.

¶ 40     Reversed and remanded.