NOTICE
Decision filed 07/16/15. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2015 IL App (5th) 140412

NO. 5-14-0412

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| SHELLEY REICHLING, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 12-L-588 |
| | ) | |
| TOUCHETTE REGIONAL HOSPITAL, INC., | ) | Honorable |
| | ) | Vincent J. Lopinot, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

JUSTICE STEWART delivered the judgment of the court, with opinion.
Presiding Justice Cates and Justice Welch concurred in the judgment and opinion.

**OPINION**

¶ 1    The plaintiff, Shelley Reichling, appeals the circuit court's order granting summary judgment in favor of the defendant, Touchette Regional Hospital, Inc. (Touchette), on the basis that her premises liability action was barred by the exclusive remedy provision of the Illinois Workers' Compensation Act (Act) (820 ILCS 305/5(a) (West 2008)) because she was Touchette's borrowed employee at the time of her injury.  On appeal, the plaintiff argues that the circuit court erred in granting summary judgment in favor of Touchette because there was a genuine issue of material fact as to whether she was Touchette's borrowed employee.  Finding no such issue of material fact, we affirm.

1

¶ 2                                    BACKGROUND

¶ 3     On February 9, 2011, the plaintiff filed an application for adjustment of claim

pursuant to the Act (820 ILCS 305/1 *et seq.* (West 2008)) for injuries she sustained on

December 26, 2010, when she slipped and fell while working at Touchette as a registered

nurse through ReadyLink Healthcare (ReadyLink), a temporary healthcare staffing

agency.  ReadyLink settled the workers' compensation claim on August 19, 2011, for

$50,125.18.  Touchette was not a party to that claim.

¶ 4     On October 30, 2012, the plaintiff filed this premises liability action against

Touchette based on the same injury at issue in her workers' compensation claim, alleging

that she was injured on December 26, 2010, when she slipped on a wet floor in

Touchette's emergency department and fell, fracturing her knee.  She alleged that

Touchette was negligent in that it failed to provide adequate warnings and failed to

barricade or otherwise segregate the area of the floor that had been mopped.

¶ 5     On April 30, 2014, Touchette filed a motion for summary judgment pursuant to

section 2-1005 of the Code of Civil Procedure (735 ILCS 5/2-1005 (West 2008)) and

memorandum in support, arguing that the plaintiff's premises liability action was barred

by the exclusive remedy provision of the Act (820 ILCS 305/5(a) (West 2008)) because

she was Touchette's borrowed employee at the time of her injury.  Touchette attached

numerous documents in support of its motion, including the plaintiff's deposition

transcript and answers to interrogatories and the written temporary services agreement

between ReadyLink and Touchette.  After additional discovery, Touchette filed a

supplemental memorandum in support of its motion, attaching additional documents in

2

support, including portions of the deposition transcripts of two of its employees. The plaintiff filed a response in opposition to Touchette's motion for summary judgment, arguing that the motion should be denied because she was not an employee of Touchette at the time of her injury. She attached numerous documents in support of her response, including the agreement between ReadyLink and Touchette, portions of her deposition transcript, portions of the deposition transcripts of several of Touchette's employees, and three documents entitled "Touchette Regional Hospital Nursing Anecdotal Note."

¶ 6    The undisputed material facts can be summarized as follows. The plaintiff, a registered nurse, was employed by ReadyLink, a temporary healthcare staffing agency based in California. She never met anyone from ReadyLink in person. Her only contact with ReadyLink was by telephone. Through ReadyLink, she worked as a temporary registered nurse at Touchette and other healthcare facilities.

¶ 7    ReadyLink and Touchette had a written agreement whereby ReadyLink would provide temporary healthcare staffing services to Touchette. The agreement provides that workers placed at Touchette are ReadyLink employees and contains a restrictive covenant prohibiting Touchette from hiring the workers. Under the agreement, ReadyLink is responsible for paying the workers and for ensuring "that any and all State and Federal Income Tax, Social Security Tax, State and Federal Unemployment Tax, Disability Tax, Worker's Compensation coverage obligations and any other employment law requirements for personnel provided under this Agreement are complied with and paid as required by law." The agreement further provides that ReadyLink indemnifies and holds Touchette harmless from any such responsibility. Pursuant to the agreement,

3

ReadyLink paid the plaintiff and provided her malpractice, general liability, and workers' compensation insurance.

¶ 8    The agreement provides that Touchette is responsible for scheduling, supervising, and evaluating the workers.    Under the agreement, Touchette is responsible for determining the proper patient treatment.  The agreement further provides that Touchette has the right to immediately terminate the services of any ReadyLink worker, if, in its sole discretion, the worker is found to be incompetent or negligent, to have engaged in misconduct, or to be unsatisfactory for any other reason.

¶ 9    The plaintiff worked at Touchette through ReadyLink during 2008, 2009, and 2010.  When Touchette needed a temporary registered nurse to work a shift, it called ReadyLink.  ReadyLink then called the plaintiff to see if she was available.  If she was available, ReadyLink notified Touchette of her availability and then called her back to confirm that she was to show up at Touchette to work that shift.

¶ 10   On November 20, 2008, the plaintiff was given a document on Touchette's letterhead entitled "Memo of Understanding," along with other materials and information regarding her work at Touchette.  The document states, in pertinent part, that "the ability to demonstrate skills and show proof of knowledge is necessary for competency of new and annual training of employees, agencies, contracted [*sic*], volunteers, and students in the hospital."  The document further states that Touchette's education department was providing her information necessary to assist in her safety while in her "*tour of duty*" (emphasis in original) in its facility.  The document notes that other materials provided to her include information about Touchette's mission/vision, security, ergonomics, customer

4

service, life safety, emergency codes, hand hygiene, incident reporting, workplace harassment, electrical safety, fire safety, compliance, and "HIPPA." She signed the document, indicating that her employer was ReadyLink but acknowledging that Touchette's unit manager, education department, or house supervisor on duty would be her resource person for any questions she may have about safety information and hazard facts. She also acknowledged that she had received an orientation/clinical information packet/card on the above-listed topics and that the material was her responsibility while on duty.

¶ 11    On May 17, 2009, the plaintiff was given Touchette's job description for a registered nurse, which was on Touchette's letterhead. The job description, which the plaintiff signed, included a summary of the job, the essential functions and duties of the job, the qualifications for the job, the preferred skills and abilities for the job, the physical demands of the job, and the duties and responsibilities of the job. Above the plaintiff's signature was the following certification:

"I certify that I am able to perform the essential duties and physical/mental functions listed above, and possess the required skills, knowledge, training, education and experience outlined above. This document does not create an employment contract, implied or otherwise, other than an 'at will' employment relationship."

¶ 12    The plaintiff usually worked the night shift at Touchette, which was from 6:30 p.m. to 7 a.m. Her supervisor at Touchette was the house supervisor on her shift. The

house supervisor would tell her which department she was scheduled to work in that day, but, other than that, she and the house supervisor had minimal contact.

¶ 13   When the plaintiff worked at Touchette, she worked with other hospital staff, including full-time doctors and nurses.  Touchette's doctors gave her orders, which she followed.  When she worked in the emergency room, she assisted other nurses working in the emergency room.

¶ 14   No one from ReadyLink was ever present at Touchette to supervise the temporary workers.  Instead, Touchette was responsible for supervising them.  The plaintiff did not have to call ReadyLink before doing a task that one of Touchette's doctors or nurses asked, or instructed, her to do.

¶ 15   Touchette provides temporary workers, such as the plaintiff, the same supplies as any other employee, *e.g.*, syringes, IV bags, IV lines, needles, and charting materials.  However, items such as scrubs, footwear, and stethoscopes are supplied by the individual nurses, whether they are full-time employees or temporary workers.

¶ 16   Temporary workers, such as the plaintiff, are required to work the same shift hours as full-time employees, and they cannot decide on their own to work over the set shift hours.  Only the department director can advise a worker (whether temporary or full-time) to work over the set shift hours.  The temporary agency that supplies a temporary worker cannot dictate the worker's hours.

¶ 17   As one of Touchette's house supervisors, Alice Page oversees its after-hours operations, including ensuring that it is adequately staffed to carry out its operations.  As a house supervisor, Page can assign a temporary worker to a particular department.

6

Temporary workers receive instruction, supervision, and assistance from Touchette employees. If a temporary worker is not doing what the worker is assigned to do or if the worker is acting unprofessionally, Page can ask the worker to leave the premises and can tell the worker not to return. If Page has a problem with a temporary worker and no longer wants the worker to work at Touchette, she notifies the temporary agency so the agency will not send the worker back to Touchette.

¶ 18   Lanneka White, Touchette's emergency department director, maintains overall operations of the emergency department. As emergency department director, White gave the plaintiff her schedules. As emergency department director, if White sees a temporary worker acting unprofessionally or not following orders, she can ask the worker to leave the hospital and can inform the worker's agency that Touchette does not want the worker back. A temporary worker, such as the plaintiff, is to follow Touchette's policies and protocol while interacting with patients and carrying out her duties.

¶ 19   Juanita Willis, one of the plaintiff's supervisors at Touchette, wrote her up three times in 2009 for violating Touchette's policies or protocols. In a February 4, 2009, document entitled "Touchette Regional Hospital Nursing Anecdotal Note," the plaintiff was written up for failing to administer a medication to one of her patients on January 29, 2009. On May 21, 2009, in another "Touchette Regional Hospital Nursing Anecdotal Note," she was written up for working over her shift without approval of Touchette's house supervisor or department managers. On June 3, 2009, in a third "Touchette Regional Hospital Nursing Anecdotal Note," she was written up for failing to transcribe the physician's orders on one of her patients on May 28, 2009, and failing to document

7

the fact that she had given the patient medication. Each of these documents concludes by noting that her agency would be notified of this occurrence and if it continued to happen it would result in her agency being informed that she may not return to Touchette.

¶ 20 On December 26, 2010, the plaintiff reported to work at Touchette as a registered nurse through ReadyLink. She was on the night shift, from 6:30 p.m. to 7 a.m., and was assigned to the emergency room. While performing her job duties that night, she slipped on a wet floor and fell, fracturing her left knee. She reported the incident to Page, Touchette's house supervisor that night, and completed an incident report on Touchette's computer system. She reported the incident to ReadyLink by telephone the next day.

¶ 21 On August 1, 2014, the circuit court granted Touchette's motion for summary judgment on the basis that the plaintiff's premises liability action was barred by the exclusive remedy provision of the Act (820 ILCS 305/5(a) (West 2008)) because she was Touchette's borrowed employee at the time of her injury. The plaintiff filed a timely notice of appeal.

¶ 22                                      ANALYSIS

¶ 23 The plaintiff argues that the circuit court erred in granting summary judgment in favor of Touchette because there was a genuine issue of material fact as to whether she was Touchette's borrowed employee under the Act. We disagree.

¶ 24 Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2008). "The purpose of summary judgment is not to try a

8

question of fact, but to determine whether a genuine issue of material fact exists." *Illinois State Bar Ass'n Mutual Insurance Co. v. Law Office of Tuzzolino & Terpinas*, 2015 IL 117096, ¶ 14. In determining whether a genuine issue of material fact exists, the pleadings, depositions, admissions, and affidavits, if any, must be strictly construed against the moving party and liberally in favor of the nonmoving party. *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 49. A genuine issue of material fact precluding summary judgment exists where the material facts are disputed or where reasonable persons might draw different inferences from the undisputed facts. *Id.* Although summary judgment can aid in the expeditious disposition of a lawsuit, it is a drastic measure and, therefore, should be allowed only where the right of the moving party is clear and free from doubt. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). A circuit court's order granting summary judgment is reviewed *de novo*. *Illinois State Bar Ass'n Mutual Insurance Co.*, 2015 IL 117096, ¶ 14.

¶ 25    "The Workers' Compensation Act is designed to provide financial protection to workers for accidental injuries arising out of and in the course of employment." *Meerbrey v. Marshall Field & Co.*, 139 Ill. 2d 455, 462 (1990). "Accordingly, the Act imposes liability without fault upon the employer and, in return, prohibits common law suits by employees against the employer." *Id.* The exclusive remedy provision of the Act is part of the *quid pro quo*, pursuant to which the employer assumes a new liability without fault but is relieved of the possibility of large damage verdicts. *Id.* Section 5(a) of the Act provides, in pertinent part, that "[n]o common law or statutory right to recover damages from the employer *** for injury or death sustained by any employee while

9

engaged in the line of his duty as such employee, other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act." 820 ILCS 305/5(a) (West 2008).

¶ 26　An employee in the general employment of one employer may be loaned to another for the performance of special work and become the employee of the special or borrowing employer while performing such special work. *A.J. Johnson Paving Co. v. Industrial Comm'n*, 82 Ill. 2d 341, 346-47 (1980). Our supreme court has long recognized the borrowed-employee doctrine as being applicable to workers' compensation cases. *Id.* at 347. The borrowed-employee doctrine was specifically incorporated into our workers' compensation statutory scheme by the inclusion of section 1(a)(4) of the Act, which provides, in pertinent part, as follows:

"Where an employer operating under and subject to the provisions of this Act loans an employee to another such employer and such loaned employee sustains a compensable accidental injury in the employment of such borrowing employer and where such borrowing employer does not provide or pay the benefits or payments due such injured employee, such loaning employer is liable to provide or pay all benefits or payments due such employee under this Act and as to such employee the liability of such loaning and borrowing employers is joint and several, provided that such loaning employer is in the absence of agreement to the contrary entitled to receive from such borrowing employer full reimbursement for all sums paid or incurred pursuant to this paragraph together with reasonable attorneys' fees

10

and expenses in any hearings before the Illinois Workers' Compensation Commission or in any action to secure such reimbursement. \*\*\*

\*\*\*

An employer whose business or enterprise or a substantial part thereof consists of hiring, procuring or furnishing employees to or for other employers operating under and subject to the provisions of this Act for the performance of the work of such other employers and who pays such employees their salary or wages notwithstanding that they are doing the work of such other employers shall be deemed a loaning employer within the meaning and provisions of this Section." 820 ILCS 305/1(a)(4) (West 2008).

¶ 27 Clearly, under the express terms of the Act, ReadyLink qualifies as a "loaning employer" because its "business or enterprise \*\*\* consists of hiring, procuring or furnishing employees to or for other employers operating under and subject to the provisions of this Act for the performance of the work of such other employers and who pays such employees their salary or wages notwithstanding that they are doing the work of such other employers" (*id.*). However, our inquiry does not end there. See, *e.g.*, *Lanphier v. Gilster-Mary Lee Corp.*, 327 Ill. App. 3d 801, 803-04 (2002) (the statutory definition of a "loaning employer" does not establish or define who shall be considered a "borrowing employer" or a "loaned employee," and the two-prong analysis set forth in *A.J. Johnson Paving Co.*, 82 Ill. 2d at 348, is the appropriate test); *Chaney v. Yetter Manufacturing Co.*, 315 Ill. App. 3d 823, 828 (2000) (same); *Crespo v. Weber Stephen Products Co.*, 275 Ill. App. 3d 638, 641-42 (1995) (same).

11

¶ 28 The two-prong inquiry required to determine whether a borrowed-employee relationship existed is: (1) whether the alleged borrowing employer had the right to direct and control the manner in which the employee performed the work; and (2) whether there was an express or implied contract of hire between the employee and the alleged borrowing employer. *A.J. Johnson Paving Co.*, 82 Ill. 2d at 348. Whether a borrowed-employee relationship existed is generally a question of fact, but if the facts are undisputed and permit but a single inference, the question is one of law. *Id.* at 348-49.

¶ 29 In workers' compensation cases, the primary factor considered in determining whether a borrowed-employee relationship existed is whether the alleged borrowing employer had the right to direct and control the manner in which the work was to be performed. *Id.* In *A.J. Johnson Paving Co.*, our supreme court found that the following factors supported a determination that the borrowing employer had the right to control and direct the manner in which the employee performed the work: (1) the employee worked the same hours as the borrowing employer's employees; (2) the employee received instruction from the borrowing employer's foreman and was assisted by the borrowing employer's employees; (3) the loaning employer's supervisors were not present; (4) the borrowing employer was permitted to tell the employee when to start and stop working; and (5) the loaning employer relinquished control of its equipment to the borrowing employer. *Id.* at 349. The court found that the fact that the employee's skill as an operator permitted him to exercise control over the paving machine and the technical details of the paving operation did not preclude a finding that the borrowing employer had the right to control the manner of the work. *Id.* The court also found that it was

12

irrelevant that the employee received his salary from the loaning employer, rather than the borrowing employer. *Id.* Illinois courts have also considered whether the alleged borrowing employer had the right to discharge the employee. See, *e.g.*, *Hastings v. Jefco Equipment Co.*, 2013 IL App (1st) 121568, ¶ 9. Although the alleged borrowing employer need not have the power to dismiss the employee from his general employment, it must have the power to dismiss him from the borrowed employment. *Id.*

¶ 30 The second factor considered in determining whether a borrowed-employee relationship existed is whether there was an express or implied contract of hire between the employee and the alleged borrowing employer. *A.J. Johnson Paving Co.*, 82 Ill. 2d at 348. "In order to establish such a contract there must be at least an implied acquiescence by the employee in the relationship." *Id.* at 350. Implied consent to an employment relationship exists "where the employee knows that the borrowing employer generally controls or is in charge of the employee's performance." *Prodanic v. Grossinger City Autocorp, Inc.*, 2012 IL App (1st) 110993, ¶ 17. "Furthermore, the employee's acceptance of the borrowing employer's direction demonstrates the employee's acquiescence to the employment relationship." *Id.*

¶ 31 In *A.J. Johnson Paving Co.*, the court found that the employee's acquiescence could be established by the fact that he was aware that the paving job was being performed by the borrowing employer and by the fact that he accepted the borrowing employer's control over the work by complying with the foreman's instructions with regard to starting, stopping, and break times, as well as instructions as to where to start

13

paving and other incidental directions as to the performance of the work. *A.J. Johnson Paving Co.*, 82 Ill. 2d at 350.

¶ 32 In *Chaney*, a case very similar to the present case, the plaintiff worked for a temporary agency that supplied the defendant with workers during peak demand periods. *Chaney*, 315 Ill. App. 3d at 825. As is common with temporary agencies, the temporary agency handled its employees' payroll, tax withholding and reporting, and insurance; the agency also provided workers' compensation coverage for its employees. *Id.* However, when the plaintiff arrived at the defendant's facility, the defendant supervised and directed her work activities. *Id.* at 829. The defendant told her to perform particular tasks, and no one from the temporary agency was involved with or consulted regarding any task she performed while working at the defendant's facility. *Id.* Although the defendant could not discharge her from her employment at the temporary agency, it could dismiss her from service at its own plant. *Id.* The appellate court affirmed summary judgment in favor of the defendant, finding that the defendant controlled the plaintiff while she was working at its facility. *Id.* at 829-30. The defendant's control was established by the fact that it supervised her work and directed her work activities. *Id.* at 829. The court held that the defendant's right to dismiss the plaintiff from service at its plant and to send her back to the temporary agency was sufficient to satisfy the discharge element of the control test. *Id.* The court noted that the mere fact that the plaintiff did not receive her wages from the borrowing employer would not defeat the finding of a borrowed-employee relationship. *Id.* The court noted that this method of compensation is so common with temporary agencies that it is of little import in the analysis of whether

14

the defendant "controlled" the plaintiff's work performance for purposes of the Act. *Id.*
The court also found that the plaintiff impliedly agreed to the borrowed-employee relationship where there was no dispute that she knew she was working for the defendant but through the temporary agency. *Id.* at 829-30. Ultimately, the court held that the plaintiff was a loaned employee and the defendant a borrowing employer for purposes of the Act; that the material facts relating to its conclusion were capable of only one inference; and, that, because the defendant was a borrowing employer, the plaintiff's civil action against it was barred by the exclusive remedy provision of the Act. *Id.* at 830.

¶ 33    *Chavez v. Transload Services, L.L.C.*, 379 Ill. App. 3d 858 (2008), is also factually similar to the present case. In *Chavez*, the plaintiff, who was employed by a temporary agency, was working as a temporary laborer for the defendant, Transload Services, L.L.C., pursuant to an agreement between the two entities. *Id.* at 859-60. When the defendant needed additional labor, it would call the temporary agency, and the temporary agency would send temporary workers. *Id.* at 860. The defendant would sign off on the hours the temporary workers worked, and the temporary agency would pay them. *Id.* The temporary agency also paid for the employees' workers' compensation insurance. *Id.* The plaintiff, who was injured while performing his duties for the defendant, filed a complaint against the defendant alleging premises liability and negligence. *Id.* The defendant filed a motion to dismiss, arguing that the plaintiff's claims were barred by the exclusive remedy provision of the Act because the plaintiff was its borrowed employee. *Id.* at 860-61. The trial court granted the motion. *Id.* at 861. The plaintiff appealed, arguing that the trial court erred in granting the defendant's motion to dismiss because

15

there was a question of fact as to whether he was the defendant's borrowed employee. *Id.* The appellate court affirmed, holding that the defendant was a borrowing employer entitled to the protections of the exclusive remedy provision of the Act. *Id.* at 864. The court noted that the plaintiff accepted the defendant's employee handbook and received individualized training from the defendant; that the defendant had the right to discharge the plaintiff for any reason, set his schedule, and control his work, all of which indicate that the defendant exercised a large degree of control over his employment; and that he was treated the same as the defendant's employees in that he worked the same hours, took breaks at times so designated by the defendant, and received instructions from the defendant as to how particular work was to be performed. *Id.* at 863. The court also noted that the plaintiff impliedly consented to the borrowed-employee relationship by accepting the employment assignment with the defendant, as well as its control and direction of his work activities. *Id.*

¶ 34 In the present case, construing the evidence strictly against Touchette and liberally in favor of the plaintiff, it is clear from the undisputed material facts that a borrowed-employee relationship existed between the plaintiff and Touchette at the time of her injury. Touchette clearly had the right to direct and control the manner in which she performed her work. Under the written agreement between ReadyLink and Touchette, Touchette was responsible for scheduling, supervising, and evaluating the plaintiff; it was also responsible for determining the proper patient treatment. In addition, Touchette had the right to immediately terminate the plaintiff's services if, in its sole discretion, she was found to be unsatisfactory for any reason.

16

¶ 35  At the time of her injury, the plaintiff had worked as a temporary nurse at Touchette for over two years. Touchette decided whether to allow her to work at its hospital, what shift she worked, what hours she worked, and what department she worked in. Touchette required her to work the same hours as its full-time employees. Touchette's doctors gave her orders, and she followed those orders. She received assistance from Touchette's employees in the performance of her duties; she assisted Touchette's employees in the performance of their duties; and she was supervised by Touchette's employees. Touchette provided her with the same equipment and supplies it provided for its full-time employees. She was required to follow Touchette's policies and protocol while performing her duties, and she was written up by her supervisors at Touchette when she failed to do so.

¶ 36  In contrast, no ReadyLink supervisors were present when the plaintiff performed her work at Touchette; nor did ReadyLink exercise any control over how she performed her work. She had never even met anyone from ReadyLink in person. Her only contact with ReadyLink was by telephone.

¶ 37  Although ReadyLink paid the plaintiff, handled her unemployment insurance, social security, and tax deductions, and carried malpractice, general liability, and workers' compensation insurance for her, it is undisputed that Touchette supplied ReadyLink with the number of hours she worked each day, and ReadyLink billed Touchette for those hours at an agreed-upon rate, which included reimbursement for those payroll expenses plus a profit. These facts suggest that ReadyLink was merely a conduit through which the plaintiff was paid, supporting the inference that she was a

17

borrowed employee under Touchette's control.  See *American Stevedores Co. v. Industrial Comm'n*, 408 Ill. 449, 455-56 (1951) (holding that the case came within the borrowed-employee doctrine as a matter of law where Frigidaire procured temporary workers through Stevedores, an agency, and Stevedores merely became the selecting agency to pick the workers and the conduit through which they were paid); see also *A.J. Johnson Paving Co.*, 82 Ill. 2d at 349 (the court did not "deem relevant" the fact that the plaintiff was paid by the loaning employer rather than the borrowing employer and stated that "[t]he mere fact that the employee does not receive his wages from the [borrowing] employer will not defeat the finding of a loaned-employee situation").

¶ 38   It is also clear from the undisputed material facts in the present case that, at a minimum, the plaintiff impliedly consented to the borrowed-employee relationship by accepting Touchette's temporary work assignments and accepting Touchette's control and direction as to her work activities.  At the time of her injury, she had been accepting temporary work assignments at Touchette for over two years.  In addition, she was given, and signed, Touchette's "Memo of Understanding," which was on Touchette's letterhead, acknowledging that she had been given other information and materials regarding her work at Touchette.  She was also given, and signed, Touchette's job description for a registered nurse, which was also on its letterhead.  That job description included a summary of the job, the essential functions and duties of the job, the qualifications for the job, the preferred skills and abilities for the job, the physical demands of the job, and the duties and responsibilities of the job.  By signing the job description, she certified that she was "able to perform the essential duties and physical/mental functions" of the job

18

and that she possessed "the required skills, knowledge, training, education and experience" required for the job. She also followed Touchette's doctors' orders and complied with Touchette's supervisors' instructions with regard to starting, stopping, and break times, as well as other incidental directions as to the performance of her work. Finally, she followed Touchette's policies and protocol in performing her duties and was written up by her supervisors at Touchette when she failed to do so.

¶ 39 Because the undisputed material facts demonstrate that Touchette directed and controlled the plaintiff's work and that she consented to the borrowed-employee relationship with Touchette, there is no genuine issue of material fact as to whether Touchette was a borrowing employer. The circuit court, therefore, properly determined, as a matter of law, that the plaintiff was Touchette's borrowed employee at the time of her injury and that her common law premises liability action against Touchette was, therefore, barred by the exclusive remedy provision of the Act. Accordingly, the circuit court properly granted summary judgment in favor of Touchette.

¶ 40 The plaintiff also argues that the agreement between Touchette and ReadyLink, whereby ReadyLink was responsible for workers' compensation claims and agreed to hold Touchette harmless from any such claims, relieved Touchette from liability under the Act and, in turn, the protection of the Act's exclusive remedy provision. We disagree.

¶ 41 The plaintiffs in *Chaney* made the same argument, and the appellate court rejected that argument, noting that to adopt the plaintiffs' argument would require it to ignore the Act's explicit provisions making borrowing and loaning employers jointly and severally liable to the employee. *Chaney*, 315 Ill. App. 3d at 830. The court noted that the Act

19

establishes a system to help ensure that the employee will recover benefits in a borrowed-employee scenario. *Id.* If the borrowing employer fails to pay the employee's claim, the loaning employer must pay the employee but has the right to seek reimbursement from the borrowing employer. *Id.* Despite the indemnification agreement between the borrowing employer and the loaning employer waiving the loaning employer's right to indemnification, the borrowing employer was still primarily liable for the borrowed employee's injuries under the Act. *Id.*

¶ 42 Similarly, in the present case, despite the indemnification agreement between Touchette and ReadyLink waiving ReadyLink's right to indemnification, Touchette was still primarily liable for the plaintiff's injuries under the Act. We, therefore, reject the plaintiff's argument that Touchette should be subject to common law tort liability in this case because, pursuant to its agreement with ReadyLink, it was not liable under the Act.

¶ 43 Finally, the plaintiff argues that Touchette is collaterally estopped from claiming that it was her employer by the workers' compensation award finding that ReadyLink was her employer. Touchette argues that the plaintiff waived the collateral estoppel issue because she failed to raise it in the trial court. We agree. The plaintiff did not raise the collateral estoppel issue in the trial court and cannot raise it for the first time on appeal. See *Parks v. Kownacki*, 193 Ill. 2d 164, 180 (2000) (issues not raised in the trial court cannot be argued for the first time on appeal).

¶ 44                                     CONCLUSION

¶ 45 For the foregoing reasons, we affirm the order of the circuit court of St. Clair County granting summary judgment in favor of Touchette.

¶ 46    Affirmed.

2015 IL App (5th) 140412

NO. 5-14-0412

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

SHELLEY REICHLING,                               )        Appeal from the
                                                 )        Circuit Court of
        Plaintiff-Appellant,                     )        St. Clair County.
                                                 )
v.                                               )        No. 12-L-588
                                                 )
TOUCHETTE REGIONAL HOSPITAL, INC.,               )        Honorable
                                                 )        Vincent J. Lopinot,
        Defendant-Appellee.                      )        Judge, presiding.
_____

**Opinion Filed:**          July 16, 2015
_____

**Justices:**          Honorable Bruce D. Stewart, J.

                       Honorable Judy L. Cates, P.J., and
                       Honorable Thomas M. Welch, J.,
                       Concur
_____

**Attorneys**          Roy C. Dripps, Michael T. Blotevogel, Armbruster, Dripps,
**for**                Winterscheidt & Blotevogel, LLC, 219 Piasa Street, Alton, IL
**Appellant**          62002
_____

**Attorneys**          Charles J. Swartwout, David B. Schneidewind, Boyle Brasher,
**for**                LLC, 5000 West Main Street, P.O. Box 23560, Belleville, IL
**Appellee**           62223
_____