NOTICE
Decision filed 04/04/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230548-U

NO. 5-23-0548

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| STEVEN TOLBERT, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Williamson County. |
| | ) | |
| v. | ) | No. 18-L-74 |
| | ) | |
| ODUM CONCRETE PRODUCTS, INC.; | ) | |
| READY MIX SOLUTIONS, LLC; and | ) | |
| ROY M. RODGERS, | ) | Honorable |
| | ) | Jeffrey A. Goffinet, |
| Defendants-Appellees. | ) | Judge, presiding. |

JUSTICE WELCH delivered the judgment of the court.
Justice Cates concurred in the judgment.
Justice Vaughan specially concurred in the judgment.

**ORDER**

¶ 1    *Held*: We reverse the order granting summary judgment in favor of defendants as there were genuine issues of material fact as to whether the plaintiff was injured by a "borrowed employee" of the plaintiff's employer. We also remand to the circuit court for further hearings consistent with this order.

¶ 2    The plaintiff, Steven Tolbert, brought a three-count complaint for negligence against the defendants, Odum Concrete Products, Inc.; Ready Mix Solutions, LLC; and Roy Rodgers, to recover for personal injuries that he sustained in a workplace incident while being employed by Millstone Weber, LLC (Millstone), the third-party defendant. Thereafter, on May 8, 2023, the defendants moved for summary judgment on the basis that Rodgers, who was alleged to have been

1

the cause of the accident, was a borrowed[1] employee of Millstone and therefore the plaintiff's remedy was exclusively under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2022)). On June 29, 2023, the trial court granted summary judgment in favor of the defendants. On appeal, the plaintiff argues that the court erred because there was a genuine issue of material fact as to whether Rodgers was a borrowed employee. For the reasons that follow, we reverse and remand for further proceedings consistent with this order.

¶ 3                                    I. BACKGROUND

¶ 4                                 A. Grinding Operation

¶ 5      In August 2016, Millstone was the general contractor on a repaving project on a portion of Interstate 57 in Goreville, Illinois. On or about August 24, 2016, the plaintiff was employed by Millstone and was working with a concrete paving crew as part of the repaving project. At the time of the incident, Millstone was conducting a grinding operation to prepare the road for repaving. The grinding operation included three different types of vehicles: a grinding machine (grinder), a cement truck, and a water tank truck. The water tank truck was supplying water to the grinder to cool it down. There was a discharge hose running from the grinder to the drum of the cement truck to collect the slurry produced by the grinder and deposit it into the cement truck's drum. During the grinding operation, the cement truck and the grinder were required to move in tandem, so that the discharge hose would not fall out of the drum.

¶ 6      The cement trucks used in the operation were owned by Ready Mix, a subsidiary of Odum Concrete Products, and were rented by Millstone for the project. Matthew Powelson, the Millstone

---

[1]These types of employees have been called "borrowed employees" and "loaned employees." Similarly, there are various names that have been used to refer to employers who loan and borrow these employees. For ease of reference, we will use the terms "general employer," "borrowing employer," and "borrowed employee."

superintendent on the job site, contacted Ready Mix on or about August 23, 2016, to rent three concrete trucks and operators. Millstone paid an hourly rate to Ready Mix for the rental of the mixing trucks and its operators. The only information that Powelson gave Ready Mix about the project was that they required an empty mixer truck and driver and that they were catching the slurry and dumping it in their batch plant.

¶ 7     According to the May 5, 2023, affidavit of Tim Mevert, the general manager of Odum and Ready Mix, neither Odum nor Ready Mix had any other details about the grinding operation. Mevert indicated that neither Odum nor Ready Mix were in the highway construction business; they also had never undertaken a highway grading or repaving project. They had no further involvement in the operation. Powelson did not request any specific employees of Ready Mix for the work or an operator with experience with this type of project. He instructed Ready Mix as to when and where the operators were to report; Mevert indicated that Powelson provided specific hours of operation for each truck and operator (7:30 a.m. until 10 a.m.). Rodgers was one of these operators. Mevert also indicated that neither Odum nor Ready Mix had any control or direction over Rodgers or any other operator working on the grinding operation that day. Although Rodgers and the other two cement truck drivers were paid by Ready Mix or Odum Concrete, not Millstone, Mevert indicated that Millstone reimbursed Ready Mix for Rodgers's paycheck for the work that Rodgers provided at the job site through the payment of the hourly rate for the rental of the truck and operator.

¶ 8     On the morning of the incident, Rodgers, a Ready Mix employee, reported to Ready Mix's Anna, Illinois, location and was informed by Ready Mix's dispatcher, Ron Tate, that he had been assigned to assist in the repaving project. Tate told Rodgers the location of the job site and the time that he was required to report. Tate also told him that, upon arrival, the Millstone employees who

were running the job site would tell him what to do. This would be the first and only time that Rodgers would be present on the job site. As Rodgers arrived at the job site, he noticed two other Ready Mix cement trucks leaving.

¶ 9 Powelson did not meet with Rodgers when Rodgers arrived at the designated site. Powelson had assigned workers to Brian Beasley, a Millstone employee who was operating the grinder, to assist in the grinding operation. In his November 29, 2022, discovery deposition, Rodgers indicated that he was given a minute or less of general instruction on what to do. Later, in his April 28, 2023, affidavit, he indicated that Beasley approached him and explained that he would be assisting with the grinding operation. Beasley instructed him to operate the cement truck along the grinder in a straight direction and at a steady speed, so that the discharge hose between the grinder and cement truck would not fall out of the drum. Beasley further instructed him that, when the grinder started taking off, he also had to move and continue moving in tandem with the grinder, following the grinder's lead. When the grinder stopped, the cement truck had to stop as well, and when the grinder backed up, the cement truck also had to back up and continue moving in tandem with the grinder. Rodgers believed that he had no discretion to deviate from the grinder's lead unless he was instructed to by Beasley. There were no other Ready Mix employees at the job site. Beasley indicated, in his December 14, 2022, discovery deposition, that he did not know whether Rodgers had performed a similar job before; that he could not recall the specific instructions that he had given Rodgers that morning but that he would have generally told him to come alongside the grinder in a straight line; and that it was a "simple task," and a "common sense" position.

¶ 10 Before beginning the grinding, Beasley placed the discharge hose inside the drum of the cement truck while Rodgers was inside his truck. The grinder was approximately 5 to 10 feet away

4

from the cement truck. At some point, Rodgers noticed Beasley taking off in the grinder. Following his lead, Rodgers then started moving and continued moving with the grinder. Several feet from the starting point, the grinder stopped moving and began backing up, so Rodgers also backed up the cement truck. Rodgers tried to move the cement truck in a straight path and maintain his original distance from the grinder. When he noticed the grinder moving closer to his truck, he tried to correct his steering to maintain the same distance between them. He then noticed the grinder stop at the point where they had begun the first pass, and he stopped his truck. He indicated in his affidavit that, because Beasley had failed to keep the grinder in a straight path, the grinder and the cement truck were about five feet from each other.

¶ 11    Beasley indicated that, during the first pass, Rodgers was moving out of time with him. Therefore, after the first pass was completed, Beasley stopped and gave him a "little pep talk." He explained what they were "looking for again" to make sure that they were on the same page. After the "pep talk," Beasley started the second pass of the operation without signaling to Rodgers that he was beginning. Beasley indicated that Rodgers would hear the grinder fire up and hopefully Rodgers was looking in the mirror and paying attention.

¶ 12    Beasley claimed that, during the second pass, Rodgers veered into the grinder, hit the grinder, and then took off further to the left at an increased rate of speed. However, Rodgers claimed that Beasley started the second pass without signaling or notifying him, and the grinder continued moving toward his truck. At that point, Rodgers attempted to correct his steering to the left, but the grinder continued moving in his direction and hit the cement truck. Rodgers then stopped the truck, and the grinder continued to move for a few feet.

¶ 13    At the time of the accident, the plaintiff was between the grinder, the cement truck, and the water truck, assisting with the operation by helping to keep the hoses straight. As a result of the incident, the discharge hose came loose and struck the plaintiff on the shoulder.

¶ 14    After the collision, Rodgers remained in his truck, and Powelson arrived and asked him what had happened. A few minutes later, the two other Ready Mix cement trucks arrived. Beasley then told Rodgers that Beasley did not need him any longer and that he could leave the job site. Rodgers indicated in his affidavit that, at that point, the drum of his cement truck was not yet full, and he could have continued working on the grinding operation. He was never asked to return to the job site.

¶ 15    Powelson subsequently administered a drug test to the plaintiff. Powelson testified that he would not require Rodgers to take a drug test because Rodgers was not a Millstone employee.

¶ 16                            B. Trial Court Proceedings

¶ 17    On April 13, 2018, the plaintiff filed a three-count complaint for negligence against the defendants for the injuries that he sustained in the incident. Specifically, the plaintiff argued that Rodgers was an agent and employee of the defendants Odum Concrete and Ready Mix. He argued that, on the day of the incident, Rodgers was working within the course of his employment; that Ready Mix and Odum Concrete had entrusted a vehicle under its control to Rodgers; and that Ready Mix and Odum Concrete had the right of control over the vehicle that was entrusted to Rodgers. The plaintiff contended that the defendants had a duty, through Rodgers, to operate the construction vehicle with reasonable care for the safety of other persons.

¶ 18    The plaintiff argued that the defendants breached that duty, through Rodgers, when Rodgers negligently and carelessly acted or failed to act in the following ways: (1) he failed to stop or swerve his vehicle to avoid a collision with another vehicle; (2) he did not have sufficient

6

control of his vehicle and was unable to stop or swerve to avoid the collision; (3) he drove his vehicle at a speed that was greater than reasonable and proper; and (4) while driving, he failed to keep an adequate lookout ahead and to the side. The plaintiff contended that, as a direct and proximate result of the defendants' negligent acts or failures to act, Rodgers drove his vehicle into another construction vehicle, which the plaintiff was assisting to operate, and consequently, the plaintiff suffered severe and permanent injuries and damages. He further argued that Ready Mix and Odum Concrete were liable for Rodgers's actions under the doctrine of *respondeat superior*.

¶ 19    In March 2020, the trial court granted the defendants leave to file a third-party complaint for contribution against Millstone. In the complaint, the defendants alleged that Rodgers was acting as Millstone's agent at the time of the incident as Millstone directed and controlled Rodgers in the grinding operation. The defendants argued that Millstone had a duty not to harm the plaintiff, and it breached that duty by (1) designing, developing, implementing, and controlling a dangerous scheme where the grinding machine and another truck traveled in tandem, connected by an unsecured hose when it knew or should have known that the scheme caused a reasonable risk of harm to others, including the plaintiff; (2) directing Rodgers to participate in this dangerous scheme; (3) failing to warn Rodgers and the plaintiff of the danger of the unsecured hose coming loose; (4) failing to properly secure the hose; (5) failing to keep a proper lookout for the plaintiff's safety; (6) failing to properly train Rodgers to operate a vehicle as part of the dangerous scheme; (7) failing to properly train the plaintiff to operate a grinding machine as part of the dangerous scheme; and (8) failing to properly supervise the dangerous scheme.

¶ 20    On October 27, 2020, Millstone filed an answer and affirmative defenses to the third-party complaint, in which it contended that the plaintiff was an employee of Millstone and that they had an employee/employer relationship that was governed by the Act. Therefore, Millstone argued that

7

its liability for the plaintiff's workplace injuries was limited to an amount equal to its statutory liability under the Act. Millstone noted that the plaintiff received workers' compensation benefits from Millstone, including the payment of medical bills, for his injuries arising from the incident. Millstone also argued that it had not waived the cap on its liability in contribution.

¶ 21　On May 8, 2023, the defendants filed a motion for summary judgment, in which they contended that they were entitled to summary judgment under section 5(a) of the Act (820 ILCS 305/5(a) (West 2022)), because, at the time of the incident, Rodgers was Millstone's borrowed employee and was acting under Millstone's exclusive direction and control. The defendants noted that the Act provided compensation for work-related injuries sustained by employees of a covered employer, and compensation under the Act was an employee's exclusive remedy for negligence claims against co-employees for injuries arising from or in the course of employment unless the injury was intentional. The defendants also noted that, for purposes of the Act, a borrowed employee relationship was established when an individual, being under the general employment of one person, was loaned by that person to another employer for the performance of special work. As long as the borrowing employer maintained control over the borrowed employee's special work, the borrowed employee would be an employee of the borrowing employer during the performance of that work. Consequently, the statutory and common law recovery bar of section 5(a) of the Act extended to cases where an employee was injured by the negligent acts of his employer's borrowed employee as long as the borrowing employer maintained control over the borrowed employee's special work.

¶ 22　The defendants argued that, at the time of the occurrence, Rodgers was Millstone's borrowed employee acting under Millstone's exclusive direction and control. Thus, the defendants

were entitled to summary judgment under section 5 of the Act as the plaintiff's exclusive remedy for his work-related injury was the compensation that he received under the Act.

¶ 23     In support of its position that Rodgers was a borrowed employee, the defendants noted that Millstone rented, from Ready Mix, the cement truck with its operator, Rodgers, to assist with Millstone's grinding operation; Ready Mix had no authority over Rodgers's shift as the times were predetermined; Millstone retained the right to discharge Rodgers from its grinding operation as Beasley, the supervisor of the operation, could have stopped it at any time if he believed Rodgers was unfit or operating in an unsafe manner; Millstone actually did discharge Rodgers from the operation immediately after the incident when Beasley told him that he was no longer needed; and he was never asked to return. The defendants argued that there was no dispute that Millstone had absolute and exclusive authority to direct Rodgers's work on the operation pursuant to its contract with the Illinois Department of Transportation (IDOT), and Powelson and Beasley were the only individuals who directed the work of the borrowed Ready Mix/Odum operators at the job site.

¶ 24     The defendants noted that, other than the time and location of the operation, which the Ready Mix dispatcher provided to Rodgers pursuant to Powelson's directions, Rodgers exclusively received instructions and directions about the work directly from Beasley. The defendants also noted that Beasley exercised physical control over Rodgers's truck as Beasley placed the discharge hose in the drum of the cement truck; and Beasley had authority to supervise and to reprimand Rodgers for his work on the operation, as evidenced by Beasley's "pep talk" to Rodgers after the first pass.

¶ 25     Further, the defendants noted that Rodgers never received any instructions or directions from Ready Mix or Odum about the specifics of the job, and no other Ready Mix or Odum employee was at the job site when Rodgers operated his truck. The defendants indicated that

9

Rodgers had no prior experience in grinding and had never operated a cement truck in tandem with another vehicle while the two vehicles were connected by an unsecured hose. The defendants argued that the method of payment also indicated that Rodgers was a borrowed employee in that, although he received his paychecks from Ready Mix, Millstone reimbursed Ready Mix for Rodgers's wages through the payment of an hourly rate for renting the truck and operator.

¶ 26    Moreover, the defendants contended that Ready Mix and Odum, being Rodgers's general employers with no authority to direct or control his work at the operation, also could not be held liable under the theory of *respondeat superior*. They argued that no liability could arise under *respondeat superior* when the general employer did not exercise any control over the employee's work that contributed to the injury.

¶ 27    On June 12, 2023, the plaintiff filed a memorandum in response to the motion for summary judgment, arguing that Rodgers was acting as an employee of Ready Mix, and not a borrowed employee for Millstone, at the time of the incident. In support, the plaintiff argued that there was "little evidence" that Millstone had complete authority over the manner of Rodgers's service as Rodgers was responsible for the safe operation of his truck, and Beasley left it to Rodgers's discretion to determine how he would complete the tandem drive with the grinder. The plaintiff indicated that, when Powelson spoke to Ready Mix dispatch about the grinding operation, he assumed that Ready Mix would supply an operator who had the requisite knowledge to complete the task.

¶ 28    Also, the plaintiff argued that Millstone had safety procedure contracts with its subcontractors but not its hired haulers, and the absence of a safety procedure contract indicated that Ready Mix and Odum were hired haulers and not subcontractors. In support of this argument, at a June 8, 2023, discovery deposition, Eric Waterkotte, the director of safety at Millstone,

10

testified that Ready Mix was a hired hauler. He explained that Millstone did not have written contracts with hired haulers or any safety policies and procedures in place regarding hired haulers. In contrast, Millstone and subcontractors had written contracts that included references to safety procedures for the employees of subcontractors.

¶ 29    Alternatively, the plaintiff contended that, if Ready Mix and Odum were classified as subcontractors, then Millstone still did not have the right to control the manner in which Rodgers completed his work. Accordingly, the plaintiff argued that there was a material fact that was in dispute and that would require a trier of fact to determine whether Rodgers was a hired hauler or a subcontractor.

¶ 30    On June 29, 2023, the trial court entered an order granting summary judgment in favor of the defendants, finding that Rodgers was a borrowed employee of Millstone. In support, the court found that Millstone was the general contractor on the repaving project and had supervisory responsibilities at the site, that Millstone's agent arranged to have the Ready Mix truck on site, that Millstone's agent provided direction to Rodgers about where to operate during the grinding, and that no one else from Ready Mix was present to direct Rodgers's operation of the cement truck. The court also found that Beasley provided Rodgers with directions as to the operation; Rodgers had no discretion as to how to operate the truck after the process began; and after the collision, Rodgers was sent back to Ready Mix and not called back to the job site. Based on these facts, the court found that Rodgers was Millstone's borrowed employee at the time of the occurrence.

¶ 31    The trial court later entered an order, pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), finding no just reason to delay the appeal. This appeal followed.

11

¶ 32                                    II. ANALYSIS

¶ 33    The sole argument on appeal is that summary judgment was improper because questions

of facts exist as to Rodgers's status as a borrowed employee.

¶ 34                              A. Summary Judgment Rules

¶ 35    Summary judgment is proper when the pleadings, affidavits, depositions, and admissions

of record show there is no genuine issue as to any material fact and that the moving party is entitled

to judgment as a matter of law. *Willfong v. Dean Evans Co.*, 287 Ill. App. 3d 1099, 1100 (1997).

A genuine issue of material fact exists where the facts are in dispute or where reasonable persons

might draw different inferences from the undisputed facts. *In re Estate of Hoover*, 155 Ill. 2d 402,

411 (1993). Although a drastic means of disposing of litigation, summary judgment is an

appropriate means to efficiently dispose of a suit when the moving party's right to the judgment is

clear and free from doubt. *Id.* at 410. When determining whether a genuine issue of material fact

exists, the trial court must construe the pleadings and evidentiary material in the record strictly

against the movant and liberally in favor of the nonmoving party. *Id.* at 410-11. We review a trial

court's decision to grant or deny a motion for summary judgment *de novo*. *Id.* at 411.

¶ 36                            B. The Law of Borrowed Employees

¶ 37    The Act provides protection to workers for accidental workplace injuries by imposing

liability on the employer without fault on the employer. *Lanphier v. Gilster-Mary Lee Corp.*, 327

Ill. App. 3d 801, 802 (2002). In exchange, the injured employee relinquishes any common law or

statutory right to recover damages from the employer. *Prodanic v. Grossinger City Autocorp, Inc.*,

2012 IL App (1st) 110993, ¶ 14. An employee who is in the general employment of one entity may

be loaned to a second entity for the performance of special work, thereby becoming the employee

of the second entity while performing the special service. *Id.* ¶ 15. The recovery bar extends to

12

cases where an employee is injured by the negligent acts of his employer's borrowed employee. See *Willfong*, 287 Ill. App. 3d at 1103. If the employee is a borrowed employee at the time of the alleged tortious conduct, the employee's general employer cannot be held liable for the conduct. *Kawaguchi v. Gainer*, 361 Ill. App. 3d 229, 238 (2005). Thus, if Rodgers was a borrowed employee of Millstone at the time of the incident, then the plaintiff's injuries were caused by a co-employee, and the plaintiff's recovery would be limited to the Act.

¶ 38     Whether a transfer of employment has occurred depends on whether the borrowing employer has the right to control the employee regarding the work performed. *Haight v. Aldridge Electric Co.*, 215 Ill. App. 3d 353, 365 (1991). The main criterion for determining when a worker becomes a borrowed employee is whether the borrowing employer has the right to control the employee with respect to the work performed. *A.J. Johnson Paving Co. v. Industrial Comm'n*, 82 Ill. 2d 341, 347 (1980). Thus, the relevant inquiry is the extent to which the general employer delegated or released to the borrowing employer the right to control. *Haight*, 215 Ill. App. 3d at 366. When determining whether an alleged borrowing employer has the right to control an alleged borrowed employee, Illinois courts have considered the following factors: (1) the manner of hiring, (2) the mode of payment, (3) the nature of the work, (4) the manner of direction and supervision of the work, and (5) the right to discharge. *Id.* Courts have also considered the terms of any written contract between the employers; whether the general employer had the ability to substitute among employees loaned to the borrowing employer; the length of service; and the change in the nature of the employee's work, from the general employer's usual work to some special or different work for the borrowing employer. *Kawaguchi*, 361 Ill. App. 3d at 240-41; *O'Loughlin v. ServiceMaster Co. Ltd. Partnership*, 216 Ill. App. 3d 27, 34-35 (1991).

13

¶ 39    Given the many factors that could be relevant in a given factual situation, it has been generally held that the existence of a borrowed-employment relationship is a question of fact. *M&M Electric Co. v. Industrial Comm'n*, 57 Ill. 2d 113, 117 (1974). Only when the undisputed facts permit but a single inference can the question be characterized as one of law. *Id*. Our task is to review the evidence in the record in a light most favorable to the plaintiff to determine if there are questions of fact as to whether Rodgers was a borrowed employee of Millstone at the time of the accident.

¶ 40    Here, the plaintiff contends that there was a genuine issue of material fact as to whether there was a borrowed employee relationship where (1) Rodgers was acting in accordance with the directions given to him by Ready Mix and utilizing the cement truck to fulfill Ready Mix's obligations to Millstone; (2) he could have stopped the work and told Millstone to request a new driver if there was a safety issue; (3) he adhered to Ready Mix's policies while operating the vehicle; (4) his adherence to Millstone's directions during the grinding operation was not an expression of control but merely a coordinated effort; (5) he was paid by Ready Mix for his work on the day of the incident; (6) the record was silent as to whether Millstone had the ability to dismiss him from working on the operation; (7) there was no contract regarding his work on the grinding operation, so the record was silent as to any control that Millstone was given over him during the operation; (8) Odum and Ready Mix had the right to send any cement truck operator as there were no terms governing which operators would be sent and whether there was a restriction on Odum's and Ready Mix's ability to substitute; (9) Rodgers had not even worked for Millstone for a few hours when the plaintiff was injured, so his length of employment was very brief; and (10) the safety director of Millstone classified Ready Mix and Odum as hired haulers, not subcontractors.

14

¶ 41 Moreover, the plaintiff contends that, even though Rodgers received directions from a Millstone employee that day, he may still maintain his status as an employee of the general employer. In support, he cites *Hastings v. Jefco Equipment Co.*, 2013 IL App (1st) 121568, ¶¶ 16-19, in which the First District held that the giving of hand signals to a crane operator was not the giving of orders but of information, and the obedience to those signals showed cooperation rather than subordination since obeying the hand signals was the only way the crane operator could operate the crane. There, the court found that some level of cooperation and coordination was necessary between the crane operators and the ironworkers on the job site, but there were questions of fact as to who had the ultimate authority and the right to control the crane. *Id.* ¶¶ 20-21.

¶ 42 The plaintiff also cites *Richard v. Illinois Bell Telephone Co.*, 66 Ill. App. 3d 825, 834 (1978), in which the First District found that a truck driver delivering and unloading asphalt for a general contractor was not a borrowed employee of the general contractor. There, a general contractor of a road construction project had hired a company to provide dump trucks to deliver and deposit asphalt at the construction site. *Id.* at 830. In finding that there was no borrowed employee relationship, the court noted that the company paid the truck driver, and the company's truck drivers had to report to its office and receive their work assignments for each day. *Id.* at 833. The court noted that, although the general contractor had the authority to tell the company drivers where to unload and when to leave the construction site, it did not have the authority to hire or fire any of them, as that authority remained with the general employer. *Id.*

¶ 43 Additionally, the appellate court also found that the fact that the truck driver obeyed the general contractor's signals as to when and where the asphalt should be dumped and when to leave for another load did not create a borrowed employee situation. *Id.* at 833-34. Instead, the court found that this showed cooperation, rather than subordination. *Id.* at 834. The court noted that,

15

before a person may be considered a borrowed employee, he must become wholly subject to the control and direction of the alleged borrowing employer; it is not sufficient that the employee is partially under the control of the alleged borrowing employer. *Id.* Similarly, the plaintiff here argues that Rodgers's adherence to Millstone's directions in the collection of and transportation of materials was not an expression of control but merely a coordinated effort. He was merely completing the obligations of his general employer with guidance from Millstone.

¶ 44    In response, the defendants contend that the undisputed facts reveal that Rodgers was Millstone's borrowed employee at the time of the accident where (1) on the date of the accident, Millstone was required, per the terms of its contract with IDOT, to maintain control and supervision of the daily activities of leased employees during the repaving project; (2) the only information that Powelson, Millstone's employee, gave Ready Mix when he rented the trucks and operators was that they needed an empty mixer truck and operator because they were catching the slurry and dumping it in their batch plant and when and where the operators should report; (3) neither Ready Mix nor Odum had any knowledge of Millstone's grinding operation; (4) Ready Mix's only instruction to Rodgers came from Ready Mix's dispatcher, who told Rodgers the location of the job site, the time that he was to report there, and that, upon arrival, a Millstone employee would tell him what to do; (5) when Rodgers arrived at the job site, Beasley, a Millstone employee, gave him specific instructions about the grinding operation and how Rodgers was to operate the truck in tandem with the grinder; (6) Beasley gave Rodgers a "pep talk" after Rodgers completed the first pass because his performance was poor; (7) Rodgers was directed to operate his truck in a manner that he had never done before; (8) Beasley dismissed him from the job site following the accident; and (9) Millstone reimbursed Ready Mix for paying Rodgers for his work that day through the costs of the rental fees.

16

¶ 45　In support of its argument that there was a borrowed employee relationship, the defendants cite *Bituminous Casualty Corp. v. Wilson*, 119 Ill. App. 3d 454 (1983), and *Willfong v. Dean Evans Co.*, 287 Ill. App. 3d 1099 (1997), as examples of borrowed employee relationships that are analogous to this case. In *Bituminous*, an employee injured on a work site brought suit against Frisch Contracting Service Co. (Frisch), the employer of the heavy-duty-equipment operator who had injured the employee. 119 Ill. App. 3d at 456. Plaintiff's employer, T.C. Bakas & Sons (Bakas), had rented heavy equipment and an operator from Frisch. *Id.* at 456-57. Frisch instructed its operator to report to Bakas's supervisors to be told the details of the job, that a Bakas foreman supervised the job, and the foreman would tell him how to perform certain aspects of the job because he had never done the particular job before. *Id.* at 457-58.

¶ 46　When the operator arrived at the job site, a Bakas employee told him what work Bakas was doing, what his job was, and that he should follow the instructions of the men there. *Id.* at 457. Frisch personnel were not on the job site and did not supervise the operator's work. *Id.* at 460. The operator worked the number of hours each day as directed by Bakas, but he was paid by Frisch. *Id.* The operator could be required to stop work at the site or be replaced for this job at Bakas's direction. *Id.* Based on these facts, the Second District Appellate Court found that the Frisch operator was a borrowed employee of Bakas. *Id.* at 460-61. In making this finding, the court concluded that the facts that the operator exercised control over the equipment and was on Frisch's payroll were insufficient to preclude findings that Bakas had the right to control the manner of the work and that there was a borrowed employee situation. *Id.* at 460.

¶ 47　Another example of a borrowed employee situation occurred in *Willfong*, in which the Fourth District affirmed summary judgment in favor of defendants. There, plaintiff, an employee of the University of Illinois (University), sustained a work-place injury when he was struck in the

17

foot with the bucket from a backhoe operated by an employee of Dean Evans Company, the University's general contractor. *Willfong*, 287 Ill. App. 3d at 1100. The operator had been hired by the general contractor to work exclusively at the University as the heavy equipment operator; the general contractor issued weekly paychecks to him based on the work he did at the University, the operator reported directly to the University for work assignments and not to the general contractor, the general contractor provided no direction for the work performed or no tools or equipment to perform the duties, and the University notified him about the availability of work. *Id.* at 1100-01.

¶ 48 Based on the above facts, the appellate court concluded that the undisputed significant facts of the case were "little different" from *Bituminous* and clearly showed the operator to be a borrowed employee of the University. *Id.* at 1102. In making this decision, the court noted that the operator operated heavy equipment that was owned by the University on the University's job site; University personnel notified the operator about the availability of work, and he took directions and supervision only from University personnel. *Id.* The court also noted that, while the general contractor paid the operator's wages, it was reimbursed by the University under their arrangement. *Id.* Thus, the court found that the operator was a loaned employee of the University and a co-employee of the plaintiff. *Id.*

¶ 49 Another example of a borrowed employee situation that the defendant argues is analogous to this case occurred in *A.J. Johnson Paving Co. v. Industrial Comm'n*, 82 Ill. 2d 341 (1980), a case in which the alleged borrowed employee sought workers' compensation benefits from the alleged borrowing employer. There, the issue was whether a heavy equipment operator employed by an asphalt company had been borrowed by a paving company when he was injured. *Id.* at 344-46. The asphalt company's paving machine was transported to the job site by a truck owned by the

18

paving company. *Id.* at 345. The asphalt company told its employee to go to the job site, and the employee reported to the paving company's foreman. *Id.* The employee was the only employee from the asphalt company on the job site. *Id.* At the site, the paving company's foreman told the employee what to do and when to stop and start work for the day. *Id.* at 346. Although the foreman did not have control over the machine, he could have told the employee to start or stop the machine. *Id.* Moreover, if the foreman was not satisfied with the employee's work, he could have ordered the employee to relay the asphalt. *Id.*

¶ 50     Also, although the foreman did not have control over when the employee took work breaks, the foreman did control the break times of the paving company's own laborers, and the employee customarily took his breaks with the laborers because he needed their assistance to operate the paving machine. *Id.* Based on these facts, the supreme court found that the evidence was sufficient to conclude that the paving company had control over the method of the employee's work, and the asphalt company relinquished control over its equipment to the paving company at the time of the employee's injury. *Id.* at 349. In making this finding, the court found that the fact that the employee's skill as an operator allowed him to exercise control over the paving machine and the technical details of the paving operation was insufficient to preclude a finding that the paving company had the right to control the manner of work. *Id.*

¶ 51                    C. Applying the Borrowed Employee Law

¶ 52     When the evidence and the reasonable inferences from the evidence are viewed in a light most favorable to the plaintiff, as required for summary judgment, the record in this case reveals genuine factual disputes as to whether Millstone controlled the manner and direction of the work performed by Rodgers. This is not a case involving undisputed facts that permit only a single inference. Neither Ready Mix nor Odum Concrete were in the business of hiring and supplying

19

employees to other companies on a temporary basis. Rodgers and the other two cement truck drivers were employed by and paid by Ready Mix, not Millstone. Ready Mix provided Rodgers with on-the-job training in the operation of its cement trucks. Ready Mix assigned Rodgers a specific cement mixer truck, and Rodgers had operated that truck for more than one year prior to the accident. Rodgers testified that he reported to the Millstone job site pursuant to the directions of his dispatcher. There was no evidence in the record to indicate that Rodgers could have declined the work assigned by Ready Mix. Millstone did not provide any written materials, tools, or equipment to help Rodgers perform his work that day. Powelson did not request any specific employees of Ready Mix for the work. The cement trucks and operators were assigned and dispatched by Tate.

¶ 53   Powelson indicated that Beasley was the supervisor of the grinding operations that day. Beasley never testified that he had the authority to direct the performance of Rodgers's work. By all accounts, Beasley gave minimal instructions to Rodgers about the grinding operations, and aside from a brief "pep talk" to ensure he and Rodgers were on the same page, Beasley paid attention to running the grinder. Beasley testified that he had no discretion in assigning specific tasks to the workers assigned to the grinding operation as each worker had their own specific jobs within their union roles. He knew that Rodgers was a truck driver, but he had no idea if Rodgers had ever performed a similar task catching slurry. Thus, there was evidence from which a trier of fact could find or infer that Rodgers was working in cooperation with, rather than as a subordinate to, Beasley.

¶ 54   Additionally, there was evidence from which a trier of fact could reasonably infer that Rodgers was responsible for his employer's truck and that he did not relinquish control over his employer's truck or the way he operated the truck. Rodgers was responsible for the safe operation

20

of his truck. Both Rodgers and Beasley could have stopped the work if they thought others were performing their work in an unsafe manner. While Beasley decided that Rodgers was no longer needed on the grinding operations, Millstone did not have the right to discipline Rodgers or to direct Ready Mix to terminate Rodgers's employment. Powelson stated that he would not have directed Rodgers to submit to a drug and alcohol screening following the accident because Rodgers was not a Millstone employee. Rodgers reported the accident to his dispatcher that day and completed an accident report when he returned to the Ready Mix facility. There is no evidence that Rodgers consented to the loaned employee relationship or that he accepted that Millstone would control and direct his work that day.

¶ 55    In reviewing the grant of a motion for summary judgment, the function of the appellate court is not to decide disputed issues of fact, but rather to determine whether a triable issue of fact exists. *Barraza v. Tootsie Roll Industries, Inc.*, 294 Ill. App. 3d 539, 548 (1997). Here, we find that there are genuine factual disputes surrounding the alleged borrowed employee relationship that remain unanswered. In deciding that there are remaining factual issues in dispute, we want to make clear that we are not expressing an opinion on whether Rodgers was actually a borrowed employee. That decision must be made by the trier of fact, and resolution of the factual disputes should await a trial on the merits. During a trial, the trier of fact would have the opportunity to observe the witnesses and to assess the credibility and the weight to be given the testimony, rather than making factual determinations on a cold record. Because the record presents a genuine issue of material fact, we find that summary judgment was improperly granted in favor of the defendants.

¶ 56                                III. CONCLUSION

¶ 57    For the foregoing reasons, we reverse the judgment of the circuit court of Williamson County and remand this case for further proceedings.

¶ 58    Reversed and remanded.

¶ 59    JUSTICE VAUGHAN, specially concurring:

¶ 60    The standard of review for a motion for summary judgment is *de novo*. *Village of New Athens v. Smith*, 2021 IL App (5th) 200257, ¶ 15. Summary judgment is only "appropriate when there is no genuine issue of material fact and the moving party's right to judgment is clear and free from doubt." *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113 (1995) (citing *In re Estate of Hoover*, 155 Ill. 2d 402, 410 (1993); *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992)). The Illinois Supreme Court set forth a two-prong analysis to determine whether a borrowed employee relationship existed: (1) whether the alleged borrowing employer had the right to direct and control the manner in which the employee performed the work; and (2) whether there was an express or implied contract of hire between the employee and the alleged borrowing employer. *A.J. Johnson Paving Co. v. Industrial Comm'n*, 82 Ill. 2d 341, 348 (1980). Additional relevant factors used to determine these two factors include: (1) the manner of hiring; (2) the mode of payment; (3) the nature of the work; (4) the manner of direction and supervision of the work; and (5) the right to discharge (see *Haight v. Aldridge Electric Co.*, 215 Ill. App. 3d 353, 366 (1991)); (6) the general employer's ability to substitute employees loaned to the borrowing employer; (7) the length of service; and (8) changes in the nature of the employee's usual work to that expected by the borrowing employer. *Kawaguchi v. Gainer*, 361 Ill. App. 3d 229, 240-41 (2005); *O'Loughlin v. ServiceMaster Co. Ltd. Partnership*, 216 Ill. App. 3d 27, 34-35 (1991). Here, I agree that whether Rodgers is properly classified as a borrowed employee presents a material question of fact precluding summary judgment; however, I fear my colleagues'

decision moves beyond the unbiased position of our review and implies that Rodgers is not a borrowed employee.

¶ 61    Starting in the middle of paragraph 52, the majority cites numerous "facts." These include that "[n]either Ready Mix nor Odum Concrete were in the business of hiring and supplying employees to other companies on a temporary basis." *Supra* ¶ 52. Nothing in the record supports this conclusion and, in fact, the record disputes such conclusion as Ready Mix supplied Rodgers to Millstone for work at Millstone's job site. The frequency of such occurrences by either party is unknown and to speculate how often this occurred is concerning.

¶ 62    My colleagues also state that, "Rodgers and the other two cement truck drivers were employed by and paid by Ready Mix, not Millstone." *Id*. This simple statement is essentially misrepresentation by omission because it ignores the fact that Millstone reimbursed Ready Mix for Rodgers's wages and further ignores well-established law stating that the fact that an employee does not receive his wages from the borrowing employer will not defeat the finding of a loaned employee situation. *A.J. Johnson Paving Co.*, 82 Ill. 2d at 349.

¶ 63    My colleagues also state that, "There was no evidence in the record to indicate that Rodgers could have declined the work assigned by Ready Mix." *Supra* ¶ 52. The statement is irrelevant in determining whether Rodgers was a borrowed employee of Millstone (see *A.J. Johnson Paving Co.*, 82 Ill. 2d at 349; *Haight*, 215 Ill. App. 3d at 366; *Kawaguchi*, 361 Ill. App. 3d at 240-41; *O'Loughlin*, 216 Ill. App. 3d at 34-35, setting forth the relevant factors) and creates the impression that Ready Mix assigned Rodgers his work duties for the Millstone work site when Ready Mix simply dispatched Rodgers to the Millstone work site and Beasley informed Rodgers of his job assignment.

23

¶ 64     Paragraph 53 is equally concerning. For example, my colleagues state, "Beasley never testified that he had the authority to direct the performance of Rodgers's work." *Supra* ¶ 53. However, the undisputed testimony revealed that Beasley initially found Rodgers' first pass on the job site lacking and therefore gave him a "pep talk." Following the second pass and accident, Beasley dismissed Rodgers from the job site. Therefore, the value of the alleged missing testimony is indeterminate in the face of the uncontroverted facts revealed that Beasley's "authority" extended to "pep talks" and eventual removal from the job site based on Rodgers' performance.

¶ 65     Paragraph 54 is equally concerning. It claims that there was "evidence from which a trier of fact could reasonably infer that Rodgers was responsible for his employer's truck and that he did not relinquish control over his employer's truck or the way he operated the truck." *Supra* ¶ 54. Again, the first two statements are irrelevant given the cited factors above. See *A.J. Johnson Paving Co.*, 82 Ill. 2d at 349; *Haight*, 215 Ill. App. 3d at 366; *Kawaguchi*, 361 Ill. App. 3d at 240-41; *O'Loughlin*, 216 Ill. App. 3d at 34-35. There was no dispute that Rodgers drove and controlled his employer's truck. The issue is whether Millstone or Ready Mix controlled the manner in which Rodgers operated the truck.

¶ 66     Paragraph 54 also contends that Millstone did not have the right to discipline Rodgers or terminate Rodgers' employment. However, the record clearly establishes that Rodgers was dismissed from the Millstone job site following the accident. Additionally, it is unclear why the majority would even suggest that a borrowing employer has the right to terminate a borrowed employee's underlying employment as a relevant factor in determining a borrowed employee's status. See *Hastings v. Jefco Equipment Co.*, 2013 IL App (1st) 121568, ¶ 9 (clarifying that the power to dismiss is related to the borrowed employment).

¶ 67 Finally, my colleagues contend that there was "no evidence that Rodgers consented to the loaned employee relationship or that he accepted that Millstone would control and direct his work that day." *Supra* ¶ 54. However, the record indisputably reveals that Rodgers's employer dispatched him to the Millstone job site, Rodgers presented to the Millstone job site and attempted to follow Beasley's directives as to how to assist on the job site during the grinding process. These actions could be indicative of consent. See *Prodanic v. Grossinger City Autocorp, Inc.*, 2012 IL App (1st) 110993, ¶ 17 ("the employee's acceptance of the borrowing employer's direction demonstrates the employee's acquiescence to the employment relationship").

¶ 68 While I believe reasonable inferences in favor of plaintiff sufficient to preclude summary judgment can be made based on the evidence, none of the above-referenced passages are reasonable given the irrelevance of the statements or the fact that some of the alleged inferences are clearly controverted by the record. The factors for consideration are set forth above. As conceded by the majority numerous factors may be considered when determining the actual status of an alleged borrowed employee; however, the main criterion is whether the borrowing employer has the right to control the employee with respect to the work performed. *A.J. Johnson Paving Co.*, 82 Ill. 2d at 347. Therefore, while I agree with my colleagues that Rodgers's status is a material question of fact left better for the trier of fact, I cannot concur with the claimed inferences set forth in paragraphs 52-54.

¶ 69 For the foregoing reasons, I specially concur.